43 So.2d 326

## CUMMINGS v. STATE.

### 4 Div. 107.

Court of Appeals of Alabama.
Dec. 1, 1949.

Clayton & LeMaistre, of Eufaula, for appellant.

A. A. Carmichael, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

HARWOOD, Judge.

This appellant has been convicted for the possession of a still to be used for the purpose of manufacturing prohibited beverages.

The evidence presented by the State was, in our opinion, ample in its tendencies to support the verdict of guilty.

Appellant's able counsel argues only one point in his brief as constituting error. After study of this record we are convinced that the point so argued constitutes the only substantial question therein, and that otherwise this record is free of error probably injurious to the substantial rights of this appellant.

The proposition asserted as error arises out of the court's action in overruling appellant's objections to testimony given by Marvin Adams, deputy sheriff of Barbour County, that at the time he arrested appellant at the still he knew appellant's reputation for violence, turbulence and bloodthirstiness, and that same was bad. This testimony was allowed before the appellant had testified and, perforce, before his character had in anywise been put in issue.

Under the circumstances under which such testimony was allowed we do not think however that error resulted.

Mr. Adams, as a witness for the State, had testified on direct examination that he, and several other officers, had secreted themselves around the still in question, and after awhile the appellant, carrying a shotgun, came to the still. There appellant

checked the mash by tasting it on his finger, and made some repairs on the dam in the branch on which the still was located. Adams arrested the defendant as he was leaving the still.

According to Mr. Adams the appellant admitted ownership of the still after he had been taken to jail. This statement was made several hours after the raid, and proper predicate was laid prior to its introduction.

On cross examination, apparently in an attempt to impeach the voluntary character of the alleged confessory statement, defense counsel inquired if he, Adams, had not held a gun in appellant's face and threatened to kill him before the statement was made. The question was answered in the negative. The record then shows that the cross examination was continued in the following tenor:

"Q. You didn't have a pistol on him at all that day? A. At the still, yes sir. When John Cummings went to leave the still I was laying on my belly out there in the grass. It was a wide open space, about as wide open as this courtroom, nothing but broom sage, and I had crawled up to as far as from here to the front of the building to the still and was laying down, and when John started towards me I raised up when he got about as far as from here to you and I said, Drop that gun, and when he dropped it I said, Turn around and go back to the still.

"Q. Who took his gun at that time? A. I took it.

"Q. Didn't you have that shot gun on that man? A. I marched him ahead of me to the car.

"Q. You had it in your hand with the gun loaded? A. It was like I got it from him. I don't know whether it was loaded or not.

"Q. You don't know whether it was loaded or not? A. No, sir.

"Q. What did you tell John Cummings you were going to do with that gun then?

Mr. Borders: We object to that. That was in the morning at the still.

"The Court: That was prior to the time he made his confession.

"Q. Just exactly what words did you say to him when you had that pistol on him and when you had that shotgun on him? A. Whenever he walked up and when I raised up in front of him, when I threw my pistol on him, he went to raise the gun and I said, John, you had better drop it or my finger might slip, and he dropped it. That's all I said.

"Q. That's all you said? A. Yes, sir.

"Q. And you picked up the gun? A. Yes, sir; and marched him to the still.

 *     *     *     *     *     *

"Q. What did you do to him at that still, or threaten to do to him, if he didn't confess? A. Not a thing in the world. I didn't have the gun at the time he confessed.

"Q. How long did you have the gun on him before he did confess? A. I had it in my hand marching him to the car.

"Q. How long was that? A. About 25 minutes, as long as we could walk that mile. It wasn't very long.

"Q. In all that time you never did threaten him in any way with that gun? A. No, sir. The only threat I made was when I raised up in front of him.

"Q. You told him your finger might slip? A. Yes, sir.

"Q. How many times did you tell him that? A. Just one time, and that's when he went to raise his gun up.

"Q. And you just said, John—that's what you called him? A. I said, John, drop that gun, my finger may slip, and he dropped it."

It was after the above cross examination that the court, over appellant's objection, admitted testimony of Adams that he knew appellant's reputation for violence, turbulence, and bloodthirstiness, the Solicitor stating at the time that such testimony was offered in explanation of Adams' conduct.

█ █  It is of course fundamental that until a witness has put his character in issue the State is not authorized to prove his bad character. Furthermore, the trait of character sought to be proved must be relative to the nature of the crime for which a defendant is being prosecuted.

However, it is equally fundamental that when a matter has been gone into by one party to a cause, the other side likewise has a right to go into the same matter and to explain away anything, if he can, that may have been brought out to his detriment. Craven v. State, 22 Ala.App. 39, 111 So. 767.

The tenor of the cross examination of the witness Adams tended to create the impression that he was over zealous in presenting and keeping the appellant under gun range at the time of his arrest and transportation to jail, and therefore tended to prejudice Adams in the eyes of the jury. This situation having been invited by appellant's counsel's cross examination, the State was, in our opinion, properly permitted to show by redirect examination of Adams that at the time he knew appellant's reputation for violence, turbulence and bloodthirstiness was bad, in order to explain his conduct, and offset such prejudice as may have been engendered by the cross examination, even if such redirect testimony was prejudicial to appellant's cause. Hamil v. U.S., 5 Cir., 298 F. 369; Sanders v. State, 131 Ala. 1, 31 So. 564; Hardin v. State, 8 Ala.App. 215, 63 So. 18; Hall v. State, 19 Ala.App. 229, 96 So. 644; Stover v. State, 25 Ala.App. 222, 143 So. 239; Davis v. State, 25 Ga.App. 532, 103 S.E. 819; Morse v. State, 85 Tex.Cr.R. 83, 210 S.W. 965; State v. Vaughn, 186 N.C. 759, 120 S.E. 338; Craig v. State, 78 Neb. 466, 111 N.W. 143; State v. McGahey, 3 N.Dak. 293, 55 N.W. 753.

Affirmed.