69 So.2d 854

## JOHNSON v. STATE.

### I Div. 551.

Supreme Court of Alabama.

Jan. 21, 1954.

Si Garrett, Atty. Gen., and L. E. Barton, Asst. Atty. Gen., for the State.

Chason & Stone, Bay Minette, for appellant.

STAKELY, Justice.

Willie Johnson (appellant) was indicted for murder in the first degree. Upon trial he was convicted of murder in the first degree and punishment was fixed at life imprisonment in the penitentiary.

Reversal of the judgment of conviction is sought (1) on alleged error in the oral charge of the court, (2) on the action of the court in overruling the defendant's motion for a new trial based on the ground that the verdict was contrary to the evidence and (3) on certain rulings of the court on the evidence.

Tendencies of the evidence show that late in the afternoon of January 17, 1953, there was a card game, known as a "skin game," going on in the house of Robert Stevenson in Fairhope, Alabama. During the game an

argument arose between Stevenson, who was one of the players, and Willie Johnson, the appellant in this case. It was asserted by Stevenson that Johnson owed him fifty cents. The argument became so boisterous that the game broke up and all the parties engaged in the game left.

After leaving Stevenson's house the appellant went to his own home and in about an hour he picked up his pistol, put it in his pocket and according to his testimony went out looking for a prowler that he had seen around his house. He went to a corner of the street across from a cafe operated by Percy Dale. This cafe is about one-half block from his house and about two doors from the house where Stevenson lived. It was at this corner that appellant shot Stevenson with a 38 caliber pistol. While the appellant was standing on the street corner talking to Mack Green, Stevenson came up and sat on the steps on the Brown Mark's store, located on the corner where appellant was standing and directly facing the Percy Dale Cafe.

According to the testimony of Theodore Lett, a witness for the State, the defendant and the deceased were standing on the corner in front of the Brown Mark's store, which was closed. It was just about "dusk dark." In other words, the State's witness was standing in the opposite street corner and was looking across the street at the two men, the defendant and the deceased. According to him, he heard the deceased say that "he was going to get his 50¢." The witness further heard the deceased cursing about having lost the 50¢ in the skin game. As the witness watched them, both men were standing straight up at a distance from each other described by the witness as "not so awful fer." When he was asked if that meant 6 or 8 feet he said "not 8 feet" and then said "fer as from me to Mr. Hubert there," a distance which he would not exactly estimate. According to the witness, they were not moving toward each other. Suddenly the defendant fired two pistol shots in quick succession, the deceased slumped to the ground, fell to his hands and knees and began holding his stomach and calling for assistance.

An autopsy disclosed that the deceased had been shot twice in the back. Both bullets made holes in the clothing of the deceased. However, one bullet appears to have been a "dud," since it merely inflicted a skin burn about 2½ inches long on the back of the deceased and then fell down into the rear part of his shirt. The other bullet was the fatal shot. It entered his back at a point below his shoulders at about 3 inches left of the center line of his back. Both Dr. Nelson E. Grubbs, State Toxicologist, and Dr. H. C. Jordan testified that there were powder burns on the jacket of the deceased and Dr. Grubbs gave it as his opinion that the gun was not more than six inches from the deceased when it was fired.

The deceased was rushed to a local hospital where he died about 2½ hours after he was shot by the defendant.

Police officers came immediately to the scene of the crime. In the meanwhile the defendant and a companion, one Mack Green, immediately left the scene of the shooting and went to the defendant's home, which was a short distance away. The officers went to the defendant's home and arrested him there. The defendant admitted to them that he had shot the deceased twice. The pistol with which he had shot the deceased was lying on the defendant's dresser in a bed room of his home. He gave it to the officers, who upon examination found that it was a 38 caliber revolver holding five bullets, two of which had been fired. The defendant expressed his sorrow over the shooting and remarked that "if it wasn't for that woman, it wouldn't have happened," and said that the deceased had cut at him with a knife.

The defendant was wearing a coat type sweater and shirt. The officers examined his clothing at this time but did not find any cut marks on the defendant's person or his clothing. The defendant claimed that the deceased was armed with a knife and that he had shot the deceased in self defense. The defendant then accompanied the arresting officers to the scene of the crime, where a search was made with the aid of a flash light for any knife with which the deceased may have been armed. Although the search was made in the presence of the de-

fendant and under his direction as to the place of the shooting, the officers were unable to find any knife. No knife was found on deceased when he was taken to the hospital and partly undressed for an emergency operation.

The defendant remained in the city jail of the town of Fairhope for about an hour and a half when the deputy sheriff arrived to take him to the jail at the county seat in Bay Minette. The deputy sheriff examined the defendant's clothing and found cuts thereon. There were three or four cuts in the defendant's sweater, one being on the side and another up around the neck line of the sweater. However there were no cuts on the defendant's body. He was wearing suspenders. Although there were some cuts in the shirt directly beneath the suspenders, the suspenders themselves had not been cut.

Witnesses for the defendant testified that Theodore Lett could not have seen the killing because at the moment the two shots were fired he was in the cafe across the street eating a fish sandwich. According to the witnesses for the defendant, the deceased started the difficulty and as the defendant turned away from him and started toward his home, the deceased attacked the defendant with a knife, tussling with the defendant, after having threatened to whip and kill him. They further testified that when defendant returned to his home after the killing his shirt was cut in the vicinity of his neck. James Williams, a boy eleven years of age, a witness for the defendant, testified that on the next morning after the killing he found a knife in the weeds a few feet from the scene of the killing. He tossed this knife over into the woods across the street and four days later it was again found and identified. A witness for the defendant testified that deceased was cleaning the knife and was heard to say that he "was going to get his 50¢" shortly prior to the difficulty.

I. The appellant contends that the jury was not properly charged by the trial judge as to self defense. In its oral charge to the jury the court said:

"Now before one can set up self-defense he must be free from fault in bringing on the difficulty. That means, gentlemen, that a man cannot go about hunting trouble and then claim the protection of the law—that he acted in self-defense—and claim that as a defense. In addition to that, he must have acted under the bona fide and honest belief that he was in imminent danger, actual or apparent, of losing his life or suffering grievous bodily harm. In that connection, gentlemen of the jury, I charge you that unless the defendant pleading self-defense in murder prosecution was in imminent danger, real or apparent, of suffering death or grievous bodily harm at the hands of the deceased when the fatal shots were fired, his plea of self-defense must fall and the question of retreat or freedom of fault need not be entered into."

The defendant excepted to part of the foregoing oral charge. The court then stated:

"I don't know just exactly what I said but I do charge you this, Gentlemen: That in that connection, I charge you this to be the law: unless the defendant, pleading self-defense in murder prosecution was in imminent danger, real or apparent, of suffering death or grievous bodily harm at the hands of the deceased when the fatal shot was fired, his right of self-defense must fall and the question of retreat or freedom from fault need not be entered into."

■ It is argued that the charge is fatally defective in that the court failed to tell the jury that the defendant had a right to act on the appearance of things. We cannot sustain this contention. The oral instructions given by the trial judge were ample and sufficient. The court spoke of imminent danger, "real or apparent." This clearly instructed the jury that the defendant was entitled to act upon the appearance of things and accordingly there was no error in this regard. McBryde v. State, 156 Ala. 44, 47 So. 302; Bluett v. State, 151 Ala. 41, 44 So. 84; Simmons v. State, 158 Ala. 8, 48 So. 606; Byrd v. State, 257 Ala. 100, 57 So.2d 388.

■ II. The appellant urges that the court was in error in refusing to grant the

motion for a new trial on the ground that the verdict of the jury was contrary to the weight of the evidence. We have considered the evidence with great care. It has been substantially set out hereinabove. It was clearly sufficient to justify the jury in finding that the defendant had not killed in self-defense and that he was guilty of a willful, deliberate, malicious and premeditated killing. Long ago in Cobb v. Malone & Collins, 92 Ala. 630, 9 So. 738, 740, the rule was laid down by this court that a trial judge will not be put in error in denying the motion for a new trial on the ground that the verdict of the jury is contrary to the weight of the evidence, "unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it is wrong and unjust." The foregoing authority also holds that "when the presiding judge refuses to grant a new trial, the presumption in favor of the correctness of the verdict is thereby strengthened." Further citation of authority is unnecessary.

III. Appellant takes the position that there should be a reversal of the lower court on the ground that the state improperly cross examined character witnesses as to specific acts of misconduct of the defendant. It is true that a character witness should not be cross examined as to his knowledge of particular acts or conduct of the defendant in order to prove such acts or conduct. Moulton v. State, 88 Ala. 116, 6 So. 758, 6 L.R.A. 301. There is a difference, however, between proof of character and testing the credibility of a witness who has testified to good character. Where a witness testifies as to the general reputation or character of the defendant, the knowledge of the witness as to such reputation or character may be tested on cross examination by asking him if he has not heard of specific acts of bad conduct on the part of the accused. But the witness may not be interrogated as to the fact of such particular acts. Helms v. State, 254 Ala. 14, 47 So.2d 276; Kervin v. State, 254 Ala. 419, 48 So.2d 204; Singley v. State, 256 Ala. 56, 53 So.2d 729. Furthermore, no prejudicial error resulted to the defendant from the line of questions

asked his character witnesses. Each of the witnesses testified that he had not heard of any such conduct on the part of the defendant. The overruling on an objection to a question not answered by the witness or favorably answered to the objector, is not prejudicial error. Stephens v. State, 250 Ala. 123, 33 So.2d 245. But it is insisted that even though the questions were answered favorably to the objector, the very asking of the questions resulted in prejudice in the minds of the jurors toward the defendant. We cannot assent to this position. A matter of this kind is largely in the discretion of the trial court. Snead v. State, 243 Ala. 23, 8 So.2d 269. On the record before us, we are not prepared to say that the questions were asked in bad faith in order to poison the minds of the jury, without any sort of foundation for them. Snead v. State, supra.

Upon a careful consideration of the record in this case, the judgment of the lower court is due to be affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.