120 So.2d 415

Edward R. PEYTON, alias

v.

STATE.

8 Div. 350.

Court of Appeals of Alabama.

Oct. 27, 1959.

As Corrected on Denial of Rehearing Feb. 2, 1960.

Crampton Harris, Birmingham, Claud D. Scruggs and Ralph Smith, Jr., Guntersville, for appellant.

John Patterson, Atty. Gen., and Wm. C. Younger, Asst. Atty. Gen., for the State.

HARWOOD, Presiding Judge.

This appellant was indicted for, and has been found guilty of, assault with intent to murder Russell W. Smith.

The appellant Edward R. Peyton was at the time of the alleged offense a representative of District 50, United Mine Workers of America. Richard W. Smith was at this time General Superintendent of the Gulf States Construction, Inc.

Gulf States Construction, Inc., was engaged in building a feed mill near Guntersville, Alabama.

The appellant, as representative of District 50, United Mine Workers of America, had sought recognition of that union as bargaining agent for the employees of Gulf States. Recognition was denied, and a strike was called, with a picket line being set up.

On 27 May 1957 a pitched battle erupted between the striking employees, and their adherents on the one side, and the officers of the company, the non-striking employees, and plant guards on the other side. The site of the battle was along a public highway in the vicinity of the entrance to the premises on which the feed mill was being constructed. One man on each side was killed and men on each side were wounded. The extent of the shooting is evidenced by the fact that a large number of guns and pistols were picked up by the officers upon their arrival at the scene a short time afterward. Weapons were found scattered along the highway, and in the bordering weeds and brush near the highway, and around a shack maintained by the pickets across the highway. Empty whisky bottles and jugs were also found near the shack.

The evidence presented by the State tended to show that about 6:45 a. m. on the morning of 27 May 1957, a convoy of three automobiles arrived at the entrance to the construction site.

Russell Smith and Al Thomas were in the lead car. Four men were in the middle car, and three in the last car. All were employees of the construction company.

Arriving at the entrance road they found it blocked by crossties, with cars or trucks placed at the ends of the crosstie barricade. Twelve or fifteen pickets or union men stood nearby, and others were seen coming out of the nearby woods or brush.

Smith testified that when he reached the crosstie blockade he started to get out of his car on the driver's side, but two or three men tried to push the car door shut, and he was told he could not go to work.

Smith further testified he succeeded in pushing out of his car, and walked to its front. Seeing the men were armed, he took his sixteen-gauge shotgun from the car as he emerged and walked to the front of his car. Leaning the shotgun against the bumper of his car, he leaned over to remove the crossties, and was shot in the arm from behind. He stepped back to get his gun and saw a Mr. Ward shoot Richardson, a bookkeeper for the construction company. Then, according to Smith: "and I ran to the left side of the car with my shotgun and Mr. Peyton had Al Thomas around the neck dragging him back away from the car and when I got about where the car door was they shot at me one time then and cut my belt in two. I throwed my shotgun on him (Peyton) and when I raised it up to shoot he shot me through the hand here, right here, and I dropped the shotgun on the ground; it went through my hand here and into my stomach right here. I dropped the shotgun on the ground then. And as I turned around to pick it up, I was shot through the back right through there; it paralyzed me and I fell to the pavement. I reached over to reach to get the shotgun again to pull it up to me and Mr. Peyton hollered, 'Kill him!' And this sandy headed boy I identified walked up over me and shot down at me when I was laying on the ground. Shot me right in here and the doctor took the bullet out there, Dr. Martin. At that time I noticed all the men coming out of the woods there

across the road. And I hollered for our men to stop shooting.

"Mr. Humphrey came around to pick me up, or Peyton told Humphrey to come around and see how he shot up his boss."

Mr. Smith testified that the appellant shot him or shot in his direction four times.

All the bullets were not removed from his body in the hospital in Guntersville. He was in an Atlanta hospital eleven days, and he receives further treatments and hospital checkups every two weeks, his left hand still being partially disabled.

On cross-examination Mr. Smith testified that Al Thomas was not armed at the time the appellant had him around the neck. At this time the appellant had a shotgun lying across the back of Thomas' neck and took a pistol out of his left-hand pocket and shot the witness with it.

On cross-examination Mr. Smith testified that Mr. Ledbetter, another representative of District 50, was present at the shooting.

He denied motioning any one at the plant to come to the scene, and likewise denied that when he first stopped at the scene that he had asked, "What are you sons-of-bitches doing here?"

Dr. Martin testified that Mr. Smith was near death when he saw him, and that the bullet wound above the belt could have produced death in a short time if medical aid had been absent.

A number of other witnesses testified for the State. The general tendency of this testimony was in accord with that presented through the witness Smith. We do not see that any useful purpose would be served in detailing this additional evidence.

Likewise we believe that the general tendency of the evidence presented by the defense may be illustrated by reference to the appellant's testimony, though again, a large number of witnesses testified for the defense.

The appellant testified he had gone to Marshall County in connection with his work as representative of District 50, United Mine Workers of America.

He had gone to the picket line the night preceding the shooting, and slept that night in an automobile parked at the scene. When he left the picket line that night there were no crossties near the entrance, and he had nothing to do with placing any crossties there. When he saw the crossties the next morning they did not block the entrance, there being a space eight or ten feet in width between them that a car could have driven through.

After he awakened the next morning he saw two or three cars drive up to the entrance of the feed mill premises. Mr. Smith got out of the lead car with a pump, or automatic, shotgun in his right hand. At this time there were thirty or forty men on the picket line, and several of them went up to Smith. At this time a man later made known to the witness as Al Thomas got out of the right-hand side of Smith's car.

Smith said something to the men who approached him. (We interpolate here that several of the defense witnesses testified that Smith asked the men, "What are you sons-of-bitches doing here?") There was a lot of loud talking.

As Smith got toward the front of his car Mr. Harrison, one of the pickets, stepped forward one or two steps. Al Thomas then pulled a pistol, rested his hand on the car door, the glass being down, and shot Harrison. When this occurred, shooting opened up in general.

Mr. Bonner got hold of Smith, and the witness got hold of Al Thomas. Smith went down on his knees, and Bonner went down with him.

A man named Burton or Barton was standing nearby with his hand in his pocket from which a pistol protruded. The appellant told Burton to throw his pistol down and when he did not do so the appellant, while still holding Al Thomas, struck Burton with a shotgun. When he did this the shotgun fired, and Burton's pistol fell to the

ground. This was the only time the appellant fired a gun during the shooting.

When this occurred "these fellows" backed off, and appellant continued his hold on Al Thomas. He backed away, and turned Thomas over to a man named Summers.

In about thirty seconds law enforcement officers arrived, and he turned Thomas' pistol over to the Chief of Police.

The appellant testified that he was never closer than six feet to Smith during the melee, and that he did not shot at Smith at any time. He also denied that he told anyone to come around and see how he had shot their boss, and he did not tell anyone to shoot anybody else.

He never at any time told anyone to bring guns, nor hear anyone else make any statement to that effect.

He did not bring any gun to the scene with him, and could not say for sure where he got the shotgun, though it must have been by a car or in the road when he got it. He left this shotgun in the pile of guns gathered by the officers.

The appellant further testified that the men put themselves on the picket line. At no time did he hear any threats made or violence advocated.

A number of the witnesses for the defense testified that Mr. Ledbetter was not present during the shooting, he having left the scene the night before.

The appellant also introduced a number of character witnesses who affirmed his good reputation.

During the direct examination of several of the State's witnesses, testimony was elicited, without objection, from them tending to show that prior to the shooting on the morning in question that the shots had been fired at or into the construction job, and further that an automobile belonging to Mr. Humphrey, Superintendent of the construction job, had been bombed.

During the cross-examination of State witness Burton, an employee of the construction company, the court sustained the State's objections to a question as to whether or not certain named persons all went out on strike about a week before the trouble, and put up a picket line.

During the cross-examination of State's witness Humphrey, the court sustained the State's objection to questions seeking to elicit testimony as to how many men had gone "down to the line" with him on the 24th (three days prior to the shooting), defense counsel stating that he offered to show through this witness that these men accompanying Humphrey took guns with them, and that Humphrey told the employees to get their checks as their names were called, and make no G—— D—— remarks about them; and also to the question as to whether the witness had a pistol with him at this time.

The court also sustained the State's objection on cross-examination as to whether he had not, on the 21st, (six days prior to the shooting) driven a truck at a fast rate of speed "down there" and knocked over Lloyd Graham, then backed the truck up to the mill and got out.

On direct examination of several of the witnesses for the defense, an attempt was again made to elicit evidence to certain occurrences prior to the shooting.

Jim Summers was asked: "Did you protest because of the rate of pay being 75 cents per hour to them before you went out on strike?" and "Had there been some of the boys that had been run over by trucks?"

Rayburn Upton testified he saw the Sheriff enter the plant three or four days before the shooting. He was then asked: "While the Sheriff was there what all did you see take place?"

D. C. Maze was asked: "Prior to that time on Friday, May 24th 1957, state whether or not you were out there on the picket line and saw some guns?" and

whether during the time he was on the picket line he saw anyone run over with a truck within the week preceding the shooting.

The witness Lloyd Graham was asked: "State whether or not anybody ran over you, knocked you down, while you were walking the picket line out there on or about the 20th of May?"

■ The court sustained the State's objections in all of the above instances, and it is the contention of counsel for appellant that the ruling in each instance constituted reversible error, in that the evidence sought was in explanation of matters injected into evidence by the State.

In Cummings v. State, 34 Ala.App. 650, 43 So.2d 326, 328, we stated:

"However, it is equally fundamental that when a matter has been gone into by one party to a cause, the other side likewise has a right to go into the *same* matter and to explain away anything, if he can, that may have been brought out to his detriment. Craven v. State, 22 Ala.App. 39, 111 So. 767."

And again in Johnson v. State, 265 Ala. 360, 91 So.2d 476, 478, the Supreme Court wrote:

"* * * Of course it is a general principal that where a matter has been gone into by one party to a cause, the other party has the right to explain away anything, if he can, that may have been brought out to his detriment. Cummings v. State, 34 Ala.App. 650, 43 So.2d 326. Further if the State introduced evidence of a prior difficulty which is illegal, the defendant can show all the particulars of the difficulty, even though illegal, to rebut the illegal evidence introduced by the State. Longmire v. State, 130 Ala. 66, 30 So. 413."

It is also clear under our decisions that the above principles apply even though the defendant did not object to such first offered evidence. Longmire v. State, 130 Ala. 66, 30 So. 413; Vaughn v. State, 236 Ala. 442, 183 So. 428.

It is to be noted that the evidence introduced by the State without objection being interposed, related to shots being fired into the construction work prior to the shooting on the morning in question, and to a bombing of an automobile of the Superintendent prior to said shooting. No objection to this evidence being interposed, its legality is not before us for review.

A reading of the questions above shows clearly they sought evidence not in rebuttal to the same acts shown by the State, but to other and different acts and occurrences. Thus the rule permitting explanation of acts or transactions first brought in by an adversary cannot be deemed to apply.

As aptly stated by the late Presiding Judge Carr in Davis v. State, 35 Ala.App. 312, 46 So.2d 242, 244:

"The rule to which reference is made relates to explanation of specific matters which have been gone into by the opposing litigant. It does not extend the inquiry into what may have transpired at other places and at different times which are entirely disassociated from the facts about which explanation is sought."

The evidence sought by the questions above pertained to matters not a part of the res gestae of this case, nor did the evidence sought shed light upon the issues of this case, being between separate parties and at different times from the act the subject of this prosecution. Such evidence was therefore irrelevant to the present issue, and the court did not err in its rulings as to the questions and matters set out above.

■ During the cross-examination of Sheriff Dickson, a witness for the State, the court sustained the State's objection to a question as to whether he "had a complaint that the Superintendent, Mr. Humphreys, had run his truck over one of them, didn't you?"

What we have written above we think is also applicable to the ruling in this instance, and negatives error on the part of the trial judge in this ruling. Further, the record shows that immediately prior to the above question Sheriff Dickson had testified as follows:

"Q. Now, you had had some complaints, hadn't you, Doc, about the drivers running over some of those boys there at that place, hadn't you? A. Yes, sir. Had one. They said one of the drivers like to have run over one of the boys.

"Q. Which one was that? A. I wouldn't know. I wouldn't know who it was."

It appears therefore additionally that the appellant had the full benefit of Sheriff Dickson's testimony along this line within the limits of his knowledge.

■ During the cross-examination of State's witness William C. Humphrey, Superintendent of the construction company, the record shows the following:

"Q. Didn't call anybody else. Didn't you make the statement out at that cafe there, the Moonglow, that you were going up and open that picket line if you had to kill all the boys on strike on that line?
"Mr. Starnes: Wait a minute. Wait a minute. We object.

"The Court: Overrule.

"Mr. Starnes: Doesn't say when, doesn't—

"Mr. Scruggs: That morning.

"Mr. Starnes: Doesn't say who was present. He is not on trial.

"The Court: Overrule. Answer the question.

"A. No, sir.

"Q. Didn't do it? A. No, sir.

"Q. Well did you make the statement out there that you liked to have run over one son-of-a-bitch out there the week be-fore and you was going to get you some yet?

"Mr. Starnes: We object to that if the Court please. I don't see the relevancy of such a statement.

"The Court: I sustain the objection."

At no time in his direct examination, nor in his cross-examination up to this point had this witness testified that he was at the Moonglow cafe. This in itself would probably justify the sustension of the objection.

However, if it be argued that the tendency of Humphrey's testimony had been to picture himself as faultless at and during the shooting, and that the question sought evidence to test the credibility of the witness, and should have been allowed for impeachment purposes, such argument is not tenable.

A witness cannot be interrogated on cross-examination as to statements made out of court contrary to his direct testimony unless he is informed of the time, place, circumstances, persons involved, and the statement inquired about. Humphries v. State, 2 Ala.App. 1, 56 So. 72; Nalls v. State, 19 Ala.App. 146, 95 So. 591; King v. State, 24 Ala.App. 267, 134 So. 133; Nichols v. State, 27 Ala.App. 435, 173 So. 652; Sparks v. State, 261 Ala. 2, 75 So.2d 103.

Since the predicate laid did not specify the party or parties to whom any alleged statement by Humphrey had been made, the court was fully justified in sustaining the objection to the question as shown above.

■ Ed Bonner, a defense witness, was recalled for further cross-examination by the State.

Over defense objections that the matter was not in rebuttal, Mr. Bonner testified that the car he was driving at the time of the shooting was a Hudson, with a light top and darker body, a Mediterranean blue in color; and that to his best recollection

he had not driven the car away from the scene after he had arrived there.

Counsel for appellant also moved to exclude all of this testimony because it was not in rebuttal to any previous evidence.

The record discloses that during his main examination Mr. Bonner testified that he had arrived at the scene about 8:30 P.M. on the night preceding the shooting; that he drove there in his car which was a Hudson Hornet, the seats of which could be made into a bed; that Mr. Peyton had spent the "entire evening" sleeping in this car.

Mr. Peyton had testified in his main examination that he had spent the night preceding the shooting in a car owned by Bonner; that the car was a Hudson with a bed in it, though he did not recall the color.

As the record shows, the witness Bonner was recalled for further cross-examination. This was clearly within the authority of the court to permit.

The evidence elicited was not in rebuttal. As shown above it was merely repetitious of undisputed matters already before the jury, and pertained to matters rather innocuous. We doubt that the color of Bonner's car had any influence in the jury's deliberations. Nor do we see that repetition by Bonner that he did not recollect leaving the scene during the night probably injured this appellant in a substantial right, particularly in view of the prior undisputed evidence to the same effect. We would not be justified in casting reversible error on the lower court in this instance.

Counsel for appellant further urges as an error, the court's ruling in connection with the cross-examination of the character witnesses presented by the defense.

The first such character witness presented by the defense was Mr. Hubert Killian, who on his direct examination testified as to appellant's good general reputa-

tion and also his good reputation as to truth and veracity.

During the cross-examination of Mr. Killian, he was asked if he had learned whether or not the appellant had some difficulty while he was a member of the police force.

Counsel for appellant first interposed a general objection to this question, and after a colloquy with State's counsel, added: "And the only thing he is authorized under the law to inquire into is whether or not this man has been convicted of a crime involving moral turpitude."

This we think, under the state of the record, must be construed as a specific ground of objection, and we think was so regarded by counsel for appellant, for during the cross-examination of subsequent character witnesses counsel as grounds for objection stated that the objection "was on the same grounds we interposed to the other."

As a matter of fact all of Mr. Killian's answers on his cross-examination were negative, in that he had never heard of, or had knowledge of appellant's quitting the police department.

■ While it is true that under the provisions of Secs. 434 and 435, Tit. 7, Code of Alabama 1940, and the numerous cases construing these sections, and found annotated thereunder, a defendant himself may be examined only as to his prior convictions of crimes involving moral turpitude, and such prior convictions, except for perjury, or subornation of perjury, do not affect his *competency* as a witness, but go only to his credibility.

We are not here dealing with the cross-examination of the appellant, but with the cross-examination of character witnesses presented by him to establish his good reputation.

■ The rule in such instances is that in the cross-examination of a witness who

has testified as to an accused's good reputation, it is permissible to ask the witness if he has not heard of certain unworthy acts or misconduct by the accused, naming the acts or conduct. Such examination goes not to the character of the accused, but to the credibility of the character witness, or that the witness was mistaken in his estimate of such character. Mullins v. State, 31 Ala.App. 571, 19 So.2d 845; Johnson v. State, 260 Ala. 276, 69 So.2d 854.

A character witness may not be cross-examined as to specific knowledge of such misconduct as may be inquired about, for character is established by reputation. Otherwise the rule against showing other offenses than the one for which the accused is being tried would, in most cases, be violated.

■ During the cross-examination of Mr. Fay Bowman, the then Chief of Police of Gadsden, he was asked whether he "recalled" that appellant and another officer were involved in some sort of liquor transaction that required a trial or dismissal or resignation as a member of the force.

Counsel objected to this question "on the same grounds we interposed to the other," i. e., that the offense did not involve moral turpitude. This was not a valid ground of objection.

The witness answered: "There was no liquor transaction I recall. It's been many years. I do know he was tried before a Civil Service Board."

Counsel for appellant then moved to exclude the answer on the grounds "that's not a court." This motion was overruled.

Clearly, that part of Chief Bowman's answer "there was no liquor transaction I recall," was negative, and in appellant's favor. The motion to exclude because the Civil Service Board was not a court, was properly overruled, since the answer tended to show misbehavior, and the character of the tribunal would not affect the admissibility of the answer.

The next character witness offered by the defense was Mr. Preston Sturkie.

On cross-examination this witness was asked:

"Q. Mr. Sturkie, did you ever hear of his being involved in any incident on the police force that led to his dismissal on account of his misconduct?"

Counsel for appellant objected to this question "on the same grounds interposed before to the other witnesses on that."

The question was not subject to the grounds of objection interposed. Regardless, the witness answered in the negative.

Likewise the remaining character witnesses, on cross-examination, gave negative answers to all questions addressed to them seeking evidence as to any acts that might reflect on appellant's past behavior.

■ As stated by Brickell, C. J., in Massey v. Smith, 73 Ala. 173: "The rule is settled by numerous decisions of this court * * * that if specific grounds of objection are taken to the admissibility of evidence, a waiver of all other objections is presumed, and on appeal this court will confine its decision to the grounds specified."

The ground specified in virtually every instance in support of appellant's objections to questions propounded to the character witnesses was that the matter inquired about did not involve moral turpitude. As shown above, this ground of objection was untenable. No error can be cast upon the court for its ruling in this aspect.

As before stated, the answers given by the character witnesses Killian, Sturkie, Hardin, and Forman, were negative.

■ Such negative answers removed the possibility of injury. Jackson v. State, 38 Ala.App. 522, 93 So.2d 804; Jackson v. State, 35 Ala.App. 542, 50 So.2d 282; Dixon v. State, 38 Ala.App. 395, 85 So.2d

156; Shouse v. State, 36 Ala.App. 614, 63 So.2d 722.

■ Nor would we, in light of the doctrine enunciated in Johnson v. State, 260 Ala. 276, 69 So.2d 854, 857, be authorized to cast error in this case because of the possible cumulative effect of questions propounded to the character witnesses and to which objections were sustained. Writing to this point in the Johnson case, supra, our Supreme Court stated:

"The overruling on an objection to a question not answered by the witness or favorably answered to the objector, is not prejudicial error. Stephens v. State, 250 Ala. 123, 33 So.2d 245. But it is insisted that even though the questions were answered favorably to the objector, the very asking of the questions resulted in prejudice in the minds of the jurors toward the defendant. We cannot assent to this position. A matter of this kind is largely in the discretion of the trial court. Snead v. State, 243 Ala. 23, 8 So.2d 269."

■ During his cross-examination, State's witness William C. Humphrey had, without objections being interposed, testified that he had called Frank Burton, another State witness, and told him there was a subpoena for him to be at this trial, and that the company would pay his expenses and mileage for his coming from Kansas.

The court then sustained the State's objections to the following questions which for convenience in discussing we have numbered.

1. "How many trips has he been here to your knowledge?"

2. "You did have him come out here back in September, didn't you?"

3. "How many of the boys have you brought in here with you this time?"

Question 1 was faulty in failing to show any agency on the part of the witness in any prior trips Burton may have made.

Question 3 was faulty in that it was immaterial how many of "the boys" Humphrey had brought with him, unless they were witnesses in this case.

As to question 2, the record shows that the witness Burton, who appeared as a witness prior to Humphrey, testified on cross-examination that this was his second trip to Alabama from Kansas; that his first trip was to appear before the Grand Jury, and on this first trip the company had given him some money to help on his expenses, though the amount given him did not cover all his expenses.

Thus question 2 related to an undisputed matter, i. e., that Burton did receive money from the company of which Humphrey was superintendent for expenses incurred on his first trip to appear before the Grand Jury. Humphrey's possible bias was thus established by undisputed evidence and the appellant could not have been injured in any substantial right by the ruling as to question 2.

Later during his cross-examination Mr. Humphrey testified that he had brought State's witness Mathis with him to the trial. The record then shows the following:

"Q. You brought him. When did you leave with Mathis to come to Guntersville?

"Mr. Starnes: If the Court please, we are going to object to this line of questioning.

"The Court: I sustain the objection to that. I think we are getting into something beyond the issues involved.

"Mr. Scruggs: I want to show the interest of this witness that he has taken in it.

"The Court: Of course I don't think that would have anything to do with interest. He definitely having been shot he is probably interested in it.

"Mr. Scruggs: We except. He having been what?

"The Court: I say having been shot himself, I would imagine he was definitely interested in it.

"Mr. Scruggs: Well, we except to the Court's remarks."

Counsel for appellant also moved for a mistrial because of the above remarks, which motion was overruled.

As stated in Housing Authority of City of Decatur v. Decatur Land Co., 258 Ala. 607, 64 So.2d 594, 598, in reference to examination of witnesses to show bias or interest:

"And for emphasis we repeat the oft-stated rule that the latitude and extent of such cross-examination is a matter which of necessity rests largely within the sound judicial discretion, which will not be revised on appeal except in extreme cases of abuse."

Mr. Humphrey having testified he had brought State's witness Mathis to Guntersville with him, we cannot see the materiality of the evidence sought as to when he left with Mathis. Clearly there was no abuse on the court's part in this ruling limiting this proliferating evidence.

While the court's remark, as to Humphrey being interested, he having been shot, would have been better left unsaid, we can see no injury to appellant in the remark. The court's observation that he was probably interested was an affirmation of the very proof appellant's counsel was seeking to show.

■ During the cross-examination of the appellant, Mr. Peyton, the court overruled an objection to a question as to whether, when State investigators had interviewed him and asked if he wanted to make a statement, he had told them he had no statement.

The witness answered he had told the investigators "No comment."

However, in connection with this ruling, the record shows that previously during his cross-examination the appellant had testified, without objection, that he had been interviewed by two State investigators, Mr. Godwin and Mr. Chambers, and had refused to give them a statement, that: "I just said 'no comment' that I had no comment to make."

As stated in Woodard v. State, 253 Ala. 259, 44 So.2d 241, 245: "The admission of testimony, if error, is harmless where the same witness has previously testified to the same facts without objection. Crenshaw v. State, 205 Ala. 256, 87 So. 328." To the same effect, see also Alston v. State, 248 Ala. 163, 26 So.2d 877; Hunter v. State, 38 Ala.App. 351, 83 So.2d 737. No error to reversal should therefore be cast upon the lower court in this instance.

■ During the cross-examination of defense witness Rayburn Upton, the following question was propounded by the prosecutor:

"Q. Well, have you been convicted then, of giving worthless checks?"

Surrounding this question there was considerable colloquy as to whether a conviction for giving worthless checks involved moral turpitude. We pretermit consideration of this point, inasmuch as the court sustained the objection to the question.

Thereupon defense counsel requested the court to instruct the prosecutor not to ask "that line of questions."

The court replied: "I will have to rule on those as I come to them. Some of them will be valid and some of them, of course, won't be.

"Mr. Scruggs: Not like that one.

"The Court: I have instructed the jury not to pay any attention to anything except what's admitted."

The objection having been sustained, and the court having instructed the jury not to

pay attention to anything except what was admitted, the court properly overruled appellant's motion for a mistrial in this instance.

Likewise no error resulted during the following portion of the cross-examination of defense witness Jim Summers:

"Q. You have been convicted of grand larceny, haven't you? A. Yes, sir.

"Q. Got a five to ten year sentence? A. That's right.

"Q. You have been found guilty of driving while intoxicated?

"Mr. Scruggs: Now wait a minute. We object to that.

"The Court: I sustain the objection to that.

"Mr. Scruggs: Now we ask the court to instruct counsel not to do that any more on one of those little misdemeanors—of anybody. I don't care who it is.

"The Court: Yes, it would have to be a felony, involving moral turpitude.

"Mr. Scruggs: And we move for a mistrial for that reason.

"The Court: Overrule."

The court having sustained the objection and having agreed with defense counsel and stated that the offense would have to be a felony involving moral turpitude, we find nothing to review in this instance. Counsel now complains that the court erred as to reversal because no instructions were given as to future questions. The court's instructions complied with counsel's request, and defense counsel not pursuing the matter further must be deemed to have been satisfied at the time. The court properly overruled the motion for a mistrial.

We are also unwilling to say that error to reverse resulted to appellant because during the recross-examination of the appellant the following is shown by the record:

"Q. And John L. Lewis organized District 50 in order to use it to organize people who are not mine workers?

"Mr. Scruggs: Now we object to that. That's highly prejudicial and it is absolutely irrelevant.

"The Court: I sustain the objection.

"Mr. Scruggs: Now we ask for another mistrial.

"The Court: Overrule.

"Mr. Scruggs: On all of the grounds we have assigned up to this stage.

"The Court: I think the jury understands by now they are not to consider anything except what the court admits into evidence. Any inference from any question would not be considered by you at all."

The court having sustained the appellant's objection to the question, and having again cautioned the jury as to what they were to consider, we find no error in this instance.

At the appellant's request the court gave some forty-one written instructions to the jury, and refused some forty-two such instructions, the refusal of which is alleged as error.

Refused charges 6, 8, 19, 20, 32, 34 and 79 are identical, respectively, with requested given charges 76, 23, 65, 7, 36, 26 and 23.

Requested charges 43, 45, 46, 47, 48 and 50, pertaining to manslaughter in the first degree were properly refused, being abstract under the issue of assault with intent to murder.

Refused charges 12, 53, 69, 70, 74 and 83, were refused without error under Bankhead v. State, 33 Ala.App. 269, 32 So.2d 814. While like or similar charges were held good in some of the earlier cases, their refusal is no longer error. In the Bankhead

case, supra, the late Presiding Judge Carr went into the history of these charges, and we will not repeat his discussion here.

 After a careful reading of the court's oral charge, and the charges given at appellant's request, we are clear to the conclusion that requested charges, 5, 15, 18, 21, 30, 31, 33, 37, 44, 49, 52, 58, 59, 66 and 78, were refused without error, in that the principles enunciated in these charges were adequately covered by the court's oral charge, or other charges given at appellant's request.

Requested refused charges No. 13 and 68, are nothing more than charges as to reasonable doubt. See Hale v. State, 10 Ala. App. 22, 64 So. 530. This principle was thoroughly covered in other charges given by the court, and charges 13 and 68 were therefore refused without error.

Requested charge 51 was refused without error in that this charge was an incorrect statement of legal principles applicable, was invasive of the province of the jury, was not hypothesized upon the evidence, and probably otherwise faulty.

Requested charge 72 was refused without error. May v. State, 35 Ala.App. 228, 45 So.2d 695.

 Requested charge 60 was refused without error. The evidence in this case was direct, not circumstantial. A court need not charge on circumstantial evidence which is even partly circumstantial. McCoy v. State, 170 Ala. 10, 54 So. 428; see also McDowell v. State, 238 Ala. 101, 189 So. 183.

Requested charge 86 was properly refused, it being faulty in several aspects. Furthermore, the principle sought to be expressed in this charge was fully and adequately covered in the court's oral charge.

Requested charges 81 and 82, each being affirmative in nature were properly refused under the developed evidence.

All of the matters discussed above were also made grounds of appellant's motion for a new trial. Our conclusions already enunciated also dictate a finding that the lower court did not err in its order overruling said motion.

A few other points are argued in appellant's brief. We have examined the instances upon which these points and arguments are based, and have concluded they are without merit, and that no discussion is indicated.

It is our opinion that this record is free of any error probably injurious to any substantial right of this appellant. The judgment is due to be affirmed, and it is so ordered.

Affirmed.

On Motion for Rehearing

We have made corrections in our opinion that will not be set forth, since they in no wise alter the conclusions already reached. We do, however, set forth the following extensions to the facts.

In brief in support of appellant's application for rehearing counsel for appellant points out that the automobile which had been bombed belonged to Mr. Maddux, the Assistant Superintendent, rather than to Mr. Humphrey, the Superintendent, as inadvertently set out in our opinion.

Counsel has also set forth under the heading "Omissions" several matters which did not appear in our opinion. In setting forth the facts we did not attempt to set them forth in detail but only to an extent sufficient to depict the situation generally, and afford a full review should the appeal be processed further. This for the reason that innumerable witnesses testified on both sides, and to have detailed the testimony, much of which was merely corroborative, would have unduly extended an already lengthy opinion.

However, knowing the earnestness of the able counsel for defense, we are treating the

matters listed under "Omissions" as a request for an extension of our opinion to include the matters mentioned by counsel.

In quoting from the testimony of State's witness R. W. Smith, we set forth: "At that time I noticed all the men coming out of the woods there across the road. And I hollered for our men to stop shooting." Counsel states, and correctly, that immediately thereafter Smith further testified: "It looked to me like we was being ambushed and they was going to murder us anyways. I told the men to stop shooting and the shooting stopped."

These conclusionary observations by Smith do not add, as we see it, anything to his earlier testimony set forth by us.

In setting forth the testimony of the appellant, Peyton, we quoted him as saying that State's witness, Smith said something to the men who approached him as Smith drove up to the entrance. "There was a lot of loud talking." We then parenthetically interpolated that several of the defense witnesses testified that what Smith had said to the men was: "What are you sons-of-bitches doing here?"

In addition to the version of Smith's statement as set out above, three of the defense witnesses testified in addition that what Smith said was that he "would kill every black son-of-a-bitch that was up there," or that he yelled, "Kill those yellow bellied sons-of-bitches."

Counsel argues that in Smith's testimony he denied only the statement attributed to him as set forth in our opinion, leaving undenied the statements attributed to him by the three witnesses above mentioned. In this connection however, we note that while in his testimony Smith denied only the specific statement as set forth in our opinion, he also further testified he had never sworn in his life.

Opinion corrected; application overruled.