163 So.2d 477

**Jesse Elliott DOUGLAS**

**v.**

**STATE.**

**2 Div. 61.**

Court of Appeals of Alabama.

Oct. 8, 1963.

Rehearing Denied Nov. 12, 1963.

Sam Earl Esco, Jr., Selma, Bryan Chancey and Gordon & Cleveland, Birmingham, for appellant.

Richmond M. Flowers, Atty. Gen., George D. Mentz and Paul T. Gish, Jr., Asst. Attys. Gen., for the State.

CATES, Judge.

Appeal from conviction of guilt of assault with intent to murder, Code 1940, T. 14, § 38: sentence, twenty years imprisonment.

Pages 6 and 7 of the record show the following:

"VERDICT AND JUDGMENT. March 3, 1962

"Comes the State of Alabama, by its Solicitor, and also comes the Defendant, Jesse Elliott Douglas, in his own proper person and by and with his attorneys, and being duly and legally arraigned in open Court upon the indictment in this cause, for answer to said indictment, pleads and says that he is not guilty in manner and form as charged therein; and issue being joined:

"Thereupon came a jury of good and lawful men, to-wit: Albert S. Champion and eleven others, who having been impanelled and duly sworn according to law, on their oaths say, 'We, the Jury, find the Defendant guilty of assault with the intent to murder as charged in the indictment. Albert S. Champion, Foreman.'

---

| "THE STATE OF ALABAMA, Plaintiff VERSUS JESSE ELLIOTT DOUGLAS, Defendant | IN THE CIRCUIT COURT OF DALLAS COUNTY, ALABAMA CASE NO. 9392 |

"SENTENCE

"March 3, 1962

"Directly the Court completed the poll of the jury, the defendant, Jesse Elliott Douglas, was called before the Court in the presence of his counsel and the following proceedings were had:

"The Court: Do you have anything to say why the judgment of the Court should not be pronounced against you at this time?

"The Defendant: No, sir.

"The Court: According to the verdict of the jury finding you guilty of assault with intent to murder, as charged in the indictment, you are accordingly adjudged to be guilty of assault with intent to murder as charged in the indictment, and as punishment for said offense you are sentenced to the penitentiary of Alabama for a period of twenty years.

"The Court: Is there notice of appeal?

"Mr. Esco: Yes, sir.

"The Court: The Court will set your appeal bond at $50,000.00

\* \* \*

"The undersigned, James A. Hare, as Presiding Judge in the trial of the above styled cause in the Fourth Judicial Circuit of Alabama, does hereby certify that the proceedings above recited are true and correct as to sentence pronounced on the defendant, Jesse Elliott Douglas, in the Circuit Court of Dallas County, Selma, Alabama, on the 3rd. day of March, 1962.

"/s/ James A Hare
"Presiding Judge"

---

Douglas moves this court to strike the portion of the transcript above quoted.

Douglas further prays that he be discharged—presumably on the ground that the above quoted matter is not a minute entry within the meaning of the statutes and rules governing the minutes of circuit courts. Code 1940, T. 7, §§ 1–5; T. 13, § 198, as amended (particularly subsec. (8)).

We consider that this motion is not well taken because the appellant has failed to allege or show that the quoted entry does not represent what actually transpired.

Douglas does not allege that the foregoing entry is untrue. Hence, if we are to consider the appeal at all, we must accept this entry. There must be a judgment of conviction before there can be an appeal. Code 1940, T. 15, § 368; Vick v. State, 156 Ala. 669, 46 So. 566 (opinion in So.Rep. only); Moss v. State, 140 Ala. 199, 37 So. 156; Ex parte Loyd, Ala., 155 So.2d 519.

The tendencies of the evidence were:

William C. Smith, a physician and surgeon of Selma, Alabama, testified as follows:

"Q Sometime during the day of January 18, 1962, did you have one Charles Layman Warren as a patient?

A Yes.

"Q Where did you first see him, Doctor? A In the emergency room at the New Vaughan Memorial Hospital.

\* \* \* \* \* \*

"Q Will you describe those injuries, Doctor? A He had injuries to his chest on the left side which apparently was caused by a gun shot of some sort.

"Mr. Esco: Now, if your Honor please, he can answer the question, but a further description of the injuries is not responsive.

"The Court: Overrule.

"Mr. Esco: We except, if you please.

"Q Proceed. A Injuries caused a partial collapse of his lung on that side and also some bleeding inside of the chest. He had other minor injuries, nicks and cuts.

"Q Did you xray his body? A Yes, sir.

"Q Did the xrays show further injuries? A Well, they showed the injuries to his lung on the left side and other organs inside his chest, and there was bleeding in his chest.

"Q And did the xrays show any foreign matter in his chest? A Yes, there were several metallic fragments. Two of these were about a quarter of an inch in diameter, and some very small minute particles.

"Q Did you perform any minor or major surgery on him? A Yes, sir, I put a small tube into his chest to remove the air and blood that had accumulated, and to remove any more that might be there subsequently.

"Q Now, you said something about one of his lungs partially collapsing. Tell us about that, Doctor. A Well, the left lung was collapsed approximately 10% to 15% of its normal size. This apparently was caused by escapement of air from his lung into his chest.

"Q Doctor, from your experience as a doctor and from your observation of these injuries that you have just described, were they the type of injuries that could have caused death? A Yes, I think they could have.

"Q Were they the type of injuries that cause grevious bodily harm? A Yes, they were serious injuries.

"Q How long did this man stay in the hospital, Doctor? A. Twelve days."

Mr. Warren testified that early in the morning of January 18, 1962, he was driving a West Brothers truck pulling a Bowman Transportation trailer. He had left Birmingham for New Orleans via U. S. Highway 11 south to Woodstock, Alabama. There he turned off on Highway 5 to the south. As he got near the crossing of Highway 5 and U. S. 80 at Brown's in Dallas County:

" * * * I met an on-coming car, and when it got even with me I heard a bam-bam, and I looked over to see if I could see what it was, and I saw the hole in the door and then I knew I was shot. I realized someone had shot me, and I got the truck stopped, and another driver who was with me helped me get across the road and lay down, and he stopped the next car and had them call the ambulance.

"Q Where did that shot come from? A It came from the car that I was meeting."

* * * * * *

"Q Did you see a car that night? A Yes, sir.

"Q About the time you were shot? A You mean around the time I was shot?

"Q Yes. A About—oh, I would say a few minutes before I was shot, there was a white '59 Ford passed me, and it was going the same way that I was going.

"Q And how long after that was it before you were shot? A It was a very short time. I couldn't give you the exact minutes, but I'd say a few minutes—a matter of a few miles.

"Q Were you able to observe the automobile tag on that car? A The one that passed me?

"Q Yes. A *Yes, sir, it was a 1–A tag.*[1] I didn't read the numbers on it."

(Emphasis supplied.)

The State's second witness was Mr. Edward Gorff, who was also driving for West Brothers running some 65–70 yards behind Warren:

"Q And in what position were you and Mr. Warren traveling? A He was in front.

"Q And who was behind? A Warren was in front and I was in the truck following him.

"Q And did you attempt to pass him? A Well, I was fixing to pass him and stop and tell him let's eat before we got way down the road.

"Q And did something happen to prevent you from passing him? A Yes, sir. We met a car.

"Q Now, previous to that, had an automobile passed you going south? A Yes, sir

"Q Did you get a look at that car? A Yes, sir.

"Q What color was it? A White.

"Q What make and model? A '59 Ford Galaxie.

"Q Did you observe the tail lights on that Ford? A Yes, sir.

"Q How many tail lights did he have? A Had one burning and one was burned out.

"Q Which one was burning and which one was burned out? A The right one was burned out and the left was shining.

"Q And had you gotten close to him —did you hear a shot that night? A Yes, sir.

"Q And had you gotten up close behind Warren when that happened? A Yes, sir.

"Q Approximately how close were you to him? A Approximately sixty-five or seventy yards.

"Q And just tell us what you saw and heard and observed there, just when you got to Highway 80. A We met this car. And I was fixing to pass him and I saw a car come over the hill and I fell back behind him. I was getting up close enough so I could stop him at the junction, and the car lights blinded me and I pulled back over to the right side of the road as far as I could to keep the lights from blinding me so I could see when he got around, and I heard this shot, and Warren put on brakes and pulled off to the side of the road. I was next, so I pulled off too, to see what was wrong.

"Q The car that was meeting you, do you know whether his lights were on bright or dim? A Well, four of them shining. I imagine they were on bright.

"Q And after you heard this shot, did that car have to come on then by you? A Yes.

"Q Did you look at it? A Well, I seen it was a white car is all I could tell, because the lights were on bright, and that's about all the time I had to see—close together.

"Q And you could tell what color it was? A Yes, sir.

---

[1]. The first number on an automobile license tag denotes county of the person who, on October 1 the beginning of the license year, is the registered owner, viz., "1" (including letter suffixes "A" and "B") for Jefferson, "2" for Mobile, "3" for Montgomery, then (in alphabetical order) "4" for Autauga, and so on through "67" for Winston. The prefix for Etowah County is 31.

"Q What color was it? A It was a white car.

\* \* \* \* \* \*

"Q And when this car first passed you going south, did you observe the tag number? A Yes, sir.

"Q And what was the prefix on there? What county was it from? A Jefferson county.

\* \*· \* \*. \* \*

"Q The next afternoon did you go to Anniston, Alabama, with Captain Thornton of the Alabama Highway Patrol? A Yes, sir.

"Q And where did he carry you?

"Mr. Esco: We object to all this. This is too remote from the scene. Not part of the res and has nothing to do with this case.

"The Court: Overrule at the present time.

"Mr. Esco: We except, if you please.

"Q Where did you go to in Anniston? A Highway Patrol office.

"Q Did you see an automobile there? A Yes, sir.

"Q Describe the automobile that you saw there.

"Mr. Esco: We object, your Honor. This is too remote from the scene of the res. The next afternoon, has nothing to do with this case whatsoever, what he saw the next afternoon some hundred miles or more away.

"The Court: Overrule.

"Mr. Esco: We except.

"Q Go ahead. A I saw a white '59 Galaxie Ford.

"Q Was that the same Ford you saw the night before?

"Mr. Esco: Your Honor please, we object.

"Q In your opinion.

"Mr. Esco: If he can identify it in some way. And we also object on the ground it is too remote.

"The Court: Overrule.

"Mr. Esco: We except.

"A I would say it was the same Ford. Only difference it had a different kind of tag on it, had an Etowah County tag on it."

About 5:00 A.M. January 18, Mr. J. E. Williamson, a State Highway Patrolman, was tending a road block some sixty miles north of Brown's Station at the junction of U. S. 11 and Alabama 5. A car came to the road block "from toward Tuscaloosa":

"Q When this automobile arrived at the intersection, which way did he go then? A Turned down Highway 5 on south.

"Q Did you stop him? A Yes, sir.

"Q Did you check his car? A Yes, sir.

"Q Who was driving thar car? A Olen Loyd.

"Q Did you see Mr. Douglas in there? A Yes, sir.

"Q Where was he sitting? A Sitting on the front seat with him.

"Q Did you check that car? A Yes, sir.

"Q Did you see anything in that car? A Yes, sir, I saw some clothing in the back seat.

"Q Did you check the trunk of that car? A Yes, sir.

"Q What did you see there? A Well, I saw a shotgun case and shell box and two lights mounted on a board and some wires.

"Q How did you know—you say one of them was named Douglas. How did you know his name was Douglas? A Checked his Social Security card.

"Q You testified there were some shells back there. Did you—

"Mr. Esco: We object to leading questions.

"Mr. McLeod: That's not a leading question, your Honor. That's not leading. I said, 'You testified—' and then my question comes thereafter.

"Q Did you testify awhile ago that you saw some shells? A I saw a shell box.

"Q Did you see what type of shells, what make? A The brand on them was Peters high velocity.

"Q Did you stop these men? I mean, did you hold them? A Well, we checked them for several minutes, yes, sir.

"Q What did you do then? A We wrote down the information and turned them loose.

"Q After that automobile drove off— well, first I'll ask you, which way did it go then? A It headed on south on Highway 5.

"Q As that car drove off, did you observe the back of it? A Yes, sir.

"Q Did you observe the tail lights? A Yes, sir.

"Q What was their condition? A One tail light was out.

"Q Which one? A I don't recall which one was out.

"Q What kind of car were they driving? A Driving a '59 white Ford.

"Q Did you later on see that car again? A Yes, sir.

"Q Where did you see it? A Over in Anniston.

"Q That same day? A Yes, sir.

"Q The car you saw in Anniston, was that the same car you saw at the intersection of Highways 5 and 11 that Mr. Douglas was in? A Yes, sir."

Loyd and Douglas were stopped in Ohatchee, Calhoun County. The policeman who stopped them searched the front of the car and found a shotgun. A pump gun was in the trunk. Neither Loyd nor Douglas objected to being stopped nor to the search of the car.

Two State Highway Patrolmen and the city officer took Loyd, Douglas, and the white '59 Ford to the Highway Patrol station in Anniston.

W. R. Jones, an investigator, Department of Public Safety,[2] testified that he "carried" Douglas from Anniston to Birmingham. There Sheriff Clark of Dallas County arrested Douglas on a warrant. Jones also took the 1959 white Ford to Birmingham and had a Capt. Godwin drive it to Montgomery. There it was turned over to a member of the State Toxicologist's staff.

At Anniston, Jones had found in the car the following:

(1) An automobile license tag for the license year expiring September 30, 1962, and bearing No. "1A–37506"—discovered under a floor mat;

(2) a shotgun in the trunk;

(3) another shotgun beneath the back seat; and

(4) a rifle in the dust pan between the car's grill and radiator.

The State then called Olen Ray Lord (defendant-appellant in Loyd v. State, 2 Div. 60). To all questions put him—except his name and address—he declined to answer.

Mr. L. C. Crocker, a deputy sheriff of Dallas County, testified that January 21,

---

2. This new arm of government to absorb and enlarge upon the old Highway Patrol was created in 1953. Act No. 585, September 11, 1953. " * * * Members of the state highway patrol when so authorized in writing by the governor shall have the power of peace officers in this state * * *." Code 1940, T. 36, § 71. See Roberts v. State ex rel. Cooper, 253 Ala. 565, 46 So.2d 5.

1962, going north from the place of Warren's being shot, he searched some eight hours along the right of way of Highway 5 for some nine and one-half miles. At this point, he found an ejected shotgun shell lying about ten feet four inches from the margin of the paving. This shell came into evidence as State's Exhibit 2.

Mr. Crocker passed this empty shell to Mr. Robert B. Finley, a member of the State Toxicologist's staff.

█ Finley testified that:

(1) He saw the empty shotgun shell (Exhibit 2) on the roadside where Mr. Crocker found it.

(2) He saw, at a truck stop at Browns in Dallas County, the tractor truck which Warren was driving when he was shot.

(3) He saw[3], at the Highway Patrol headquarters in Montgomery, a white 1959 Ford car with a 1962 tag, 1A–37056, under the front seat.

(4) He saw a Winchester shotgun in the rear seat of this car.

(5) He saw a quantity of "Peters" 00 magnum load, 12-gauge shotgun shells in this car.

(6) He saw a plastic wad in the tractor truck.

(7) He took a similar wad from one of the "Peters" 00 magnum load 12-gauge shotgun shells which he found in the 1959 Ford.

(8) He had never seen any wadding of this type except in "Peters" 00 magnum load shells.

(9) He had fired a "Peters" 00 magnum load 12-gauge shotgun shell in the Winchester shotgun with the firing pin leaving a distinctive imprint "of a small defect" in the hull of the shell.

(10) He observed the hull found on the road (Exhibit 2) and the hull he test fired in the gun under a comparison microscope.

(11) In his opinion, both hulls had been fired from the Winchester shotgun.

(12) From shooting through cardboard, he was of the opinion that when fired the distance from the gun was "not greater than eight feet from the tractor."

Because of points in Douglas's brief, we set forth three excerpts from the evidence:

1. Testimony of Robert B. Finley (from p. 107):

"Q Mr. Finley, will you show that picture to the jury and explain it to them? A (The witness stands before the jury) On all fire arms there are markings that are true marks and which when a shell is fired in a particular weapon those marks are left on the shell. So we can take a questioned shell and a test shell which we fired from a weapon—in this case, a shotgun—and under a double microscope, each one under a separate microscope in which they are connected, enabling us to see a portion of each hull at the same time. These markings, true markings that are on the weapon, are left on the hull when the shell is fired. If we are able to match up these markings where they will continue across the split image here (indicating)—in other words, this being the test round which I fired and this is the test hull which was found on the highway, if we are able to show a continuation of these markings that is indication that the evidence hull was fired in the particular shotgun in question.

"Q Now, from your checking of that, are the markings similar? A Yes, sir.

"Q And from this test that you ran and other tests, are you of the opinion that the hull that you found on the highway, Highway No. 5, and the test hull were both fired from the same shotgun? A It is my opinion that

---

3. Photographs which Finley took show the car with Etowah County tags (31–27514).

they both were, that the hull found on Highway 5 was fired from this shotgun.

"Mr. Esco: If you Honor please, we move to exclude on the grounds that this man has not been qualified as an expert in the field in which he is now testifying. We move to exclude his testimony.

"The Court: Overrule.

"Mr. Esco: We except, if you please."

2. Testimony of Robert B. Finley (from pp. 111–112):

"Q Mr. Finley, did you make some test shots to ascertain the distance, how far that would be, to make the hole that was made in that vehicle? A Yes.

"The Court: Just a moment. Do you want to take him on voir dire?

"Mr. Esco: I would like to read into the record that the solicitor is now demonstrating to this witness and before this jury a group of cardboard cards in which there are various holes, showing what I expect is a shotgun pattern, and which he is asking this witness about. We certainly object to the showing of those to the jury or any testimony concerning them. They are not the same material, metal, and there has been no proper predicate laid showing what conditions the tests were made in.

"The Court: Objection is overruled.

"Mr. Esco: We except, if you please.

"Q Mr. Finley, I will show you a cardboard marked for identification purposes as Plaintiff's Exhibit No. 37, and ask you do you recognize that? A Yes.

"Q And what do these holes in here represent? A That represents a pattern in which I fired from this Winchester shotgun at a distance of eight feet.

"Q Will you show that to the jury?

"Mr. Esco: If your Honor please, we object to it. It is not in evidence and we object. Let the record show he is showing a cardboard pattern with evidence shotgun holes in it to the jury. We object on the grounds that it is not a fair comparison of the thing to be tested against, which is metal, and he is showing cardboard here; and he has laid no predicate to show that this is a comparative metal or a comparative pattern that's been made. It is not a fair comparison.

"The Court: Overrule.

"Mr. Esco: We except.

"Q Is there any distinction in the pattern if it is shot into cardboard or if it is shot into metal?

"Mr. Esco: We object to his answering unless the predicate has been laid showing him to be an expert.[4]

"Mr. McLeod: I qualified him.

"Q In your opinion are they similar when they are fired into cardboard or

---

4. The learned trial judge correctly sustained objection to a question using the word "criminalist" to characterize Finley. We have found no statutory definition of "criminalist." Webster's 2nd International Dictionary: "Criminalist. 1. One versed in criminal law. 2. One addicted to criminality; also a psychiatrist dealing with criminality." Webster's Third New International Dictionary retains 1 but changes 2 to "2: a specialist in criminology."

In People v. Taylor, 152 Cal.App.2d 29, 312 P.2d 731, the court's opinion implies that the word "criminalist" seems to have no single fixed meaning. Upon consideration of criticism leveled at Webster's Third, (e. g., Saturday Review, September 30, 1961, Vol. 44:19–20, November 10, 1962, Vol. 45:70; Time, October 6, 1961, Vol. 78:49—" * * * more a Social Register of words than a Supreme Court of language."; Science, November 10, 1961, Vol. 134:1493), we cannot accord it authority superior to that of the Second Edition. See Adler v. State, 55 Ala. 16; Cook v. State, 110 Ala. 40, 20 So. 360.

fired into metal? A Well, no, I believe in metal is somewhat of a different—

"Mr. Esco: (Interrupting) We object. He has answered the question, he said no.

\*　\*　\*　\*　\*　\*

"Q Can you make a comparison by these tests that you were just testifying to? A I can use the test to form an opinion.

"Q And the opinion that you have formed, how far was the shotgun away from the tractor when it was fired into?

"Mr. Esco: We're going to object, your Honor, unless the proper predicate is shown to show how he knows what he knows, whether or not he is qualified as an expert, whether or not he under the same conditions has made a test in a speeding automobile against a speeding truck; of the same metal that was involved in the vehicle hit, same shell was used, same brand and type and size was used, and the same age shell as far as that's concerned.

"The Court: Overrule.

"Mr. Esco: Exception, if you please.

"Q Answer. Do you remember the question? A Will you read it, please?

"Court Reporter: (Reading from her notes) 'And the opinion that you have formed, how far was the shotgun away from the tractor when it was fired into?'

"A It is my opinion that it was a distance *not greater than eight feet.*

"Mr. Esco: We move to exclude the testimony

"The Court: Overrule." (Italics supplied.)

3. Testimony of Robert B. Finley (from pp. 114–115):

"Q Now Mr. Finley, this wadding that you said you removed from double 'O' buckshot, during your four and a half years experience as a criminalist for the State of Alabama have you ever seen any wadding of this type except in Peters double 'O' magnum load?

\*　\*　\*　\*　\*　\*

"A No.

"Q Do you have available to you at the State Department of Toxicology's laboratory numerous shells that are manufactured in the United States? Yes.

"Q And do you have—in the laboratory do you have shells of all types that you know of as being manufactured in the United States? A We have numerous shells but I don't know that we have one of every type.

"Q Is it every type that you know of? A Yes.

"Q Now, Mr. Finley, is this the only type of wadding that is used in a gun? A No.

"Q What other type is used? A Hair type of wadding.

\*　\*　\*　\*　\*　\*

"Q Were there other shells found in the car? A Yes.

"Q Were shells found in the ammo belt? A Yes, sir.

"Q Were there shells found in that Peters box in there? A Yes, sir.

"Q And was it a great many of them? A Yes, sir.

"Q Now, Mr. Finley, I will show you Plaintiff's Exhibit No. 10, and ask you do you recognize that? A Yes.

"Q I will show you Plaintiff's Exhibit No. 11, and ask you do you recognize that? A Yes.

"Q And where did you find that ammunition? A This, I found double 'O' magnum load in this automobile; and this one, double 'O' magnum, which I purchased myself."

Douglas adduced no evidence, and did not except to the oral charge. In brief, he makes no contention that the court erred in the refusal of any charge tendered by him in writing. Code 1940, T. 7, § 273.

Appellant's brief contends for the following propositions:

1. No legal evidence was before the grand jury, hence the court should have sustained defense motion to quash the indictment.

2. On hearing this motion, the court erred in excluding questions as to evidence before the grand jury.

3. "Evidence does [not] support a conviction of assault with intent to murder because the State's own evidence negates such an intent."

4. No predicate of substantially similar conditions was laid for evidence of out of court experiments.

5. Newspaper accounts prejudiced defendant, hence his motion to continue should have been granted.

6. Minutes are the only proof of judgments.

7. Offering inadmissible evidence before a trial jury ground for mistrial if the evidence is capable of provoking prejudice against the defendant.

8. "Arraignment is absolutely [sic] in Alabama."

## I.

### The Motion to Quash

We group here the first two of appellant's contentions: (A) as to there being no legal evidence before the accusing jury; and (B) the trial judge's excluding evidence sought from the grand jurors at the hearing on this motion to quash.

### A. No Legal Evidence

The record before us (p. 4) shows a motion listing six grounds: (1) "not suffi-

cient legal evidence"; (2) no "legal evidence" to establish corpus delicti; (3) "did not have competent witnesses or legal documentary evidence" before them; (4) no legal evidence to indict defendant; (5) indictment was based solely on a confession extorted from an alleged accomplice, Olen Ray Loyd; and (6) that Loyd's confession came from violation of the McNabb rule.[5]

The first witness called by the defense in aid of the motion was a grand juror. He testified that the only evidence before the grand jury was the testimony of the sheriff. Included in this was a written confession of Loyd which the sheriff read to the grand jury.

On cross (by the State), the grand juror's testimony was in part:

"Q Did Mr. Clark testify and tell you that a man had been shot out here on No. 5 highway by the name of Charles L. Warren? A Yes, sir. I'd already stated that.

"Q And did he testify to other facts involved in that crime? A Yes, sir.

"Q And did Sheriff Clark give the grand jury evidence that the defendant, Jesse Elliott Douglas, was involved in that shooting? A Yes, sir.

"Q And beside his testimony did he have a legal document before you? A He had a document, yes, sir."

On redirect the defendant's counsel summarized and had the witness adopt as follows:

"Q And Sheriff Clark, as the only witness appearing, told you that a man had been shot, that he had some evidence that was being examined by the toxicologist, and he had a purported confession. Is that all of the evidence that he had connecting Mr. Douglas with this crime? A That's all I can think of at this time."

Another juror was called and stated that the sheriff proffered a shotgun shell as well as the signed confession. Part of his examination in chief went:

"Q Did he bring you any direct evidence at all that a crime had been committed? A Well, we knew about that. Yes.

"Q How did you know, Mr. Coffee? A Well, we knew about the man in the hospital that had received the wound.

"Q How did you know about that? A · Well, we was told about it.

"Q By whom? A Well, the sheriff, for one.

"Q Before the grand jury? A We knew that was the reason he didn't appear there.

"Q You were told by the sheriff about the man in the hospital? A Yes.

"Q And what were you told by the sheriff about him?

"Mr. McLeod: I object to that question.

"The Court: Sustain the objection.

"Mr. Esco: We except, if you please.

"Q Did you yourself observe the man in the hospital? A No.

"Q Did any man on the grand jury? A Not to my knowledge.

"Q Did any other witnesses appear before the grand jury except Sheriff Clark? A I don't believe so."

And from redirect we quote:

"Q The evidence related from somebody else's confession, Mr. Coffee, is that right? A Yes.

"Q And that's the only way you connected Mr. Douglas, with somebody else's purported confession, signed by a purported accomplice, was the only evidence before the grand jury connecting Mr. Douglas with this incident. Is that right? A Basically I guess that's right, because—as I remember, the information that we had came from the confession and from the investigation of the sheriff, which were related to us.

"Q And did he demonstrate to you anything that was a result of that investigation? A You mean what he found out?

"Q No, what he found. Did he find any physical evidence that he demonstrated to you? A You mean by physical evidence objects?

"Q That's right. A Well, the shell I guess would be a physical object.

"Q You mean by 'the' shell, you mean by 'a' shell? A Yes. Or physical objects, they had guns taken from the automobile.

"Q You had guns before the grand jury? A No, not before the grand jury, but he told us about guns that they had.

\* \* \* \* \* \*

"Q Well, to the best of your knowledge Sheriff Clark was testifying purely from what he had been told, was he not? A Well, that and what he had found out with his investigation.

"Q At no time did he tell you that he had observed the shooting or escaping car or anything surrounding the incident himself, did he? A No.

"Q And this purported confession that you saw was a handwritten document. Did you recognize that handwriting? A No, I didn't recognize the handwriting.

"Q And did you recognize anything about it that would indicate to you that you knew who had written it or signed it? A No. I had to go on what I was told.

"Q And do you know that it was purportedly written by an accomplice of Mr. Douglas? A Yes.

"Q But it was not written, signed, or witnessed by Mr. Douglas, was it? A I don't believe so."

■ Indictments must come from evidence either (a) given viva voce by witnesses before the grand jury or (b) furnished by documents laid before that body. Sheriff Clark's having been a witness before the grand jury is enough to comply with Code 1940, T. 30, § 86, which reads in pertinent part as follows:

"§ 86. In the investigation of a charge for any indictable offense, the grand jury can receive no other evidence than is given by witnesses before them, or furnished by legal documentary evidence; * * *."

■ This section permits a grand jury to indict on hearsay alone, if furnished by a witness before the grand jury. Washington v. State, 63 Ala. 189; Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397; Jones v. State, 81 Ala. 79, 1 So. 32; Agee v. State, 117 Ala. 169, 23 So. 486. Younger, Case Note, IX Ala.Law Rev. 92.

■ Lack of cross-examination is the bedrock of the exclusion of hearsay before trial juries. Before a grand jury the suspect is given no opportunity to be represented. Hence, hearsay exclusion would be without the adversary means to implement it. Clark v. State, 240 Ala. 65, 197 So. 23; Fikes v. State, 263 Ala. 89, 81 So.2d 303; Gandy v. State, 32 Ala.App. 513, 27 So.2d 798. Cases such as Walker v. State, 17 Ala.App. 555, 86 So. 257, must be viewed as ignoring the effect of Washington, supra.

■■ The confession of Loyd was inadmissible before a petit jury trying Douglas under the rule of Connelly v. State, 30 Ala. App. 91, 1 So.2d 606. But since the hearsay exclusion does not operate before a grand jury, then Connelly would not affect the indictment against Douglas.

B. Details of Evidence before Grand Jury

■ The weight, credit and quantity of what evidence a grand jury receives is not a matter of enquiry once it is shown that that body had either a witness or a document before it. The trial judge was not in error. Gaines v. State, 146 Ala. 16, 41 So. 865, following the leading case of Sparrenberger v. State, 53 Ala. 481.

II.

Evidence of Intent to Kill

Appellant's brief, in arguing proposition III, states:

"The state offered no facts which indicated an intent to kill Mr. Warren. The only facts from which such an intent could possibly be inferred is the use of a shotgun. However, the circumstances clearly negate an intent to kill. The state's evidence shows that the assailant knew that Mr. Warren would be encased in a heavy steel body of the tractor truck he was driving. The choice of a shotgun instead of a rifle was intentionally made to avoid the possibility of someone getting killed. Although some shot did penetrate the tractor door and injure Mr. Warren, it was not with sufficient force to kill him. Had the assailant intended to kill, he would have used the rifle and shot Warren when he passed going in the same direction. Certainly no intention to kill can be inferred from the discharge of a shotgun between two vehicles traveling at high speeds and in opposite directions."

This argument, if based on uncontradicted proof of Warren's being in an armored vehicle, might have had some force with the jury. However, four of the exhibits (3, 6, 13 and 32) introduced by the prosecution show the window ledge and pane of the tractor cab torn open. This hole is consistent with the evidence of its being made with a shotgun.

The physician's testimony and Warren's evidence afforded the jury a description of wounds which, in our opinion, are sufficient when coupled with the use of a deadly weapon to support an inference of malice.

**328**

■ Under assault with intent to murder punishable under Code 1940, T. 14, § 38, the word "murder" is contextually that of the Common Law, i. e., the killing of a rational (human) being with malice aforethought. Hence, malice must be established. Letcher v. State, 145 Ala. 669, 39 So. 922 (opinion in So. Rep. only).

In Walls v. State, 90 Ala. 618, p. 622, 8 So. 680, p. 682 (modifying Smith v. State, 88 Ala. 23, 7 So. 103), we find an admonition to charge juries as to the need to find from all the evidence that the accused intended to take the life of the victim of his assault. See Horn v. State, 98 Ala. 23, 13 So. 329, as to need for "facts [to] raise the presumption of intent to murder."

Ray v. State, 147 Ala. 5, 41 So. 519, states that use of a deadly weapon near enough to fatally wound may support a jury's inferring (shown by verdict) the malicious character of the assault.

■ Proof of both intent to kill and malice must exist. Both can be inferable from the same act of using a deadly weapon unless the circumstances (e. g., self defense) refute either such intent or malice. Sparks v. State, 261 Ala. 2, 75 So.2d 103.

■ We consider the question here was one of fact; therefore, within the jury's province and not reviewable on appeal. Loyd's confession did not come into evidence against Douglas so that whatever Loyd said therein is not relevant.

### III.

### Out of Court Experiments

■ In ground 62 of his motion for new trial Douglas assigned that "the court erred in overruling the defendant's objections to the testimony of Robert B. Finley."

Presumably, he refers to rulings as to Mr. Finley testifying as to tests he made wherefrom he determined that the shot into Warren's tractor cab was made from not more than eight feet away. Cf. Anno. 86 A.L.R.2d 611, § 6, at p. 643.

In the second excerpt quoted above from Finley's testimony, there are three objections to plaintiff's Exhibit 37, a piece of cardboard into which Finley had fired the Winchester shotgun. This series of objections runs:

(1) a) "not the same material, metal"; and

 b) no showing of conditions "tests were made in";

(2) "not a fair comparison"—metal versus cardboard; and

(3) not under same conditions (a) speeding automobile vs. speeding truck, (b) same metal, (c) same shell, i. e., brand, type and size, (d) same age shell.

Under the majority opinion in Straughan v. State, 270 Ala. 229, 121 So.2d 883, the pattern of shot scattering from a shotgun is not legally in the realm of common knowledge. One shown to be an expert can testify as to his opinion as to the distance from muzzle to target. Brock, the scattering expert, was properly allowed to base his opinion on (a) the gun and (b) the area of the body covered by the shot

Whether the subject's being beyond common knowledge would make inadmissible a layman's evidence of out-of-court experiments in this field, we need not decide. Exhibit 37 was not introduced and was not certified with the record, hence we consider our review is limited to whether the State established Finley's qualifications as an expert witness on the pattern of scattering of shot from a shotgun so as to testify on hypothetical assumptions.

Finley (R. p. 103) testified he had had a period of four and one-half years of training with the State Toxicologist's bureau. During that time he had "tested" from 400 to 500 firearms of which 150 to 200 were shotguns. Considering the proof of Finley's testing some 150 to 200 pieces, we see no abuse of the trial court's discretion in view of the express holding in Straughan, supra.

Familiarly, the expert is someone with knowledge which the trial judge deems superior to that of the average man. Though Finley disclaimed himself as possessing special knowledge of "ballistics" we take it he was using this term in the sense of one who is skilled in comparing striations in bullets imparted by the lands and grooves of guns having rifled bores. Evans v. Commonwealth, 230 Ky. 411, 19 S.W.2d 1091, 66 A.L.R. 360; Wigmore, Note (warning against charlatan witness), 25 Ill.Law Rev. 692; 5 Am.Jur., Proof of Facts, Firearms Identification, at p. 126.

## IV.

### Opinion as to Shotgun Shell

 Finley's testimony as to the hulls having been fired from the Winchester shotgun was properly predicated. In Kyzer v. State, 250 Ala. 279, 33 So.2d 885, it was proper for a jury to compare an "evidence shell" with two "test shells" fired from the evidence gun.

Here Finley demonstrated his path of research by means of exhibits including large photographs of the "evidence shell," the breech block and firing pin of the "evidence gun" and "test shell." See Kent v. State, 121 Tex.Cr. 396, 50 S.W.2d 817.

Certainly some firearms tests cannot be made in the courtroom. The reasoning of Ferrell v. Commonwealth, 177 Va. 861, 14 S.E.2d 293, amply supports the trial judge.

## V.

### Motion for Continuance Because of Newspaper Reports

Warren, when shot, was driving a West Brothers truck pulling a trailer of Bowman Transportation Company. This latter company was engaged in a labor dispute with its drivers.

In oral argument there was some contention that violence which attends labor disputes is a phenomenon furnishing a legal justification similar to that claimed for those engaged in sports or warfare. This argument was made but rejected as a legal factor in defense of criminal charges in Peyton v. State, 40 Ala.App. 556, 120 So.2d 415.

 Much as the motor vehicle's making death more frequent without mitigating manslaughter, so outbursts of industrial friction must be treated by common law standards unless the Legislature should direct otherwise.

Along the same line as the contention of one ground of Douglas's motion for continuance were his Exhibits A, B, C, and D, clippings from The Selma Times-Journal, The Birmingham Post-Herald, The Birmingham News, and The Montgomery Advertiser. These were claimed to have made it impossible to strike an unbiased jury.

We find no error in the trial judge's overruling this motion. See the opinion of Price, P. J., in the companion appeal of Loyd v. State, 2 Div. 60.

## VI.

### Use of Written Confession to Refresh Recollection of Recalcitrant Witness

### A.

 Loyd, an accomplice, was convicted the day before Douglas was put to trial. The State called him as a witness against Douglas.

After answering a few preliminary questions, some straightforwardly, others by "Not to my knowledge," or "I'm not sure," Loyd was asked, " * * * if on the night of January 20, 1962, in Selma, Alabama, in the Dallas County jail didn't you make the following statement: 'I, Olen Ray Loyd, make the following statement of my own free will, * * * '?"

To which Loyd replied, "I refuse to answer on the immunity of the laws of the State of Alabama and my constitutional rights."

Douglas can take nothing from the ruling of the court on Loyd's claim of immunity

from self-crimination. The privilege is personal. Had Loyd waived it, Douglas would have been confronted with testimony legal to use against him. Beauvoir Club v. State, 148 Ala. 643, 42 So. 1040; 8 Wigmore, Evidence (McNaughton rev. 1961), § 2259.

### B.

A more serious claim of prejudice comes from the solicitor's reading from Loyd's purported confession.

An accomplice's confession given after the res gestae is not admissible against an accused before a petit jury. There must be confrontation face to face to allow viva voce cross-examination before the jury. Connelly v. State, supra; Patterson v. State, 202 Ala. 65, 79 So. 459; Gore v. State, 58 Ala. 391; Wharton, Criminal Evidence (12th Ed.), §§ 437–38. See Hunter v. State, 112 Ala. 77, 21 So. 65; also McAnally v. State, 74 Ala. 9.

In the instant case the purported written confession of the accomplice, Loyd, was used by the solicitor in cross examining Loyd after Loyd's being declared a hostile witness. The confession was put to Loyd in twenty-one consecutive fragments by questions such as:

"Q 'I, Olen Ray Loyd, make the following statement of my own free will, voluntarily and without any threats or hope of reward to Ralph Holmes, whom I know to be a state investigator, Sherif James G. Clark of Dallas County, Alabama.' Did you make that statement and sign it? A I refuse to answer on the immunity of the laws of the State of Alabama and my constitutional rights.

"Q I further ask you, didn't you say, 'I have been informed that I do not have to make any statement unless I desire to do so, that any statement I do make can be used * * *'"

The twentieth and twenty-first questions imply that the series made a complete document:

"Q And then in your own handwriting did you say, 'I, Olen Ray Loyd, have had above read to me, consisting of ten pages which I have initialed, and they are true and correct to the best of my knowledge.' And signed your name, 'Olen Ray Loyd'. Is that true? A I refuse to answer under the laws of Alabama and my constitutional rights.

"Q Then down below your name it was signed, 'Witnessed by Ralph Holmes, investigator for the Department of Public Safety of the State of Alabama', and under his name, 'James G. Clark, Sheriff, Dallas County, Alabama', and under his name, 'R. W. Godwin'. Was that done in your presence? A I refuse to answer under the laws of Alabama and my constitutional rights."

In Willingham v. State, 261 Ala. 454, at p. 459, 74 So.2d 241 at p. 245, per Simpson, J., we read:

" * * * the appellant complains of the action of the trial court in permitting the State to show a written statement to the State's witness and asking the witness if that was her handwriting, if she had signed it in the Solicitor's office and if she didn't say that James Willingham struck at the Brown boy. As to the latter question, the appellant objected and made a motion for a mistrial. The court in one ruling overruled same. The appellant argues that the State was attempting to impeach its own witness. In Louisville & N. R. R. Co. v. Hurt, 101 Ala. 34, 13 So. 130, the court permitted the plaintiff to ask his own witness if he had not testified on a former trial in a certain manner. It was there held that it is a matter wholly within the discretion of the court to permit a party to refresh the memory of a witness. The court pointed out that was frequently and properly done by showing the witness a memorandum, and by calling the attention of the witness to a particular statement. The same situation obtains here and we

find no reversible error in this action of the trial court."

We distinguish the instant means from that found bad in Kissic v. State, 266 Ala. 71, 94 So.2d 202, 67 A.L.R.2d 530. The opinion there plainly refuses to hold putting an impeaching transcription in evidence to be erroneous. The reversible error was playing the record before the jury (266 Ala. at p. 76, 94 So.2d at p. 206):

" * * * We are not to be understood to hold that this latter admission into evidence was erroneous. The error was in the *playing of the record* in the presence of the jury when it contained illegal hearsay evidence and prejudicial statements. To permit either the state or the defendant to play records previously made of complete conversations with witnesses under the pretext of refreshing their recollection, would open the door to putting evidence before the jury which could never be admitted under the established rules of evidence, * * *." (Italics added.)

Thereafter a State witness was recalled. The record shows:

*"W. R. JONES,* recalled to the stand, testified further as follows:

"DIRECT EXAMINATION BY MR. McLEOD

"Q Major Jones, I show you a paper here that is marked for identification purposes as Plaintiff's Exhibit No. 1, and ask you do you recognize that? A Yes, I do.

"Q And on the night of January 20, 1962, were you present in the Dallas County jail? A Yes, I was.

"Q I will ask you if you are the same Major Jones who was on the stand previously? A Yes, sir.

"Q And who was present when Olen Loyd signed that? A Lt. Ralph Holmes, and Mr. Bob Godwin, and Sheriff Clark, and FBI Agent Frye, and yourself—Bob Frye of the FBI.

"Q Did you see him sign it? A Yes, and Mr. Finley was present too.

"Mr. McLeod: Your witness.

"Mr. Esco: Did you introduce that instrument?

"Mr. McLeod: No, I didn't introduce it. I just had it marked for identification purposes.

"Mr. Esco: Let the record show, if you will, that the solicitor questioned as to State's Exhibit No. 1, and we move to exclude on the grounds that the document is based purely on hearsay.

"The Court: Motion is denied.'

"Mr. Esco: We except, if you please."

The same proof was made by the testimony of Lt. Ralph Holmes, a State investigator, and also by that of an agent of the Federal Bureau of Investigation. The defense did not object to any of the questions to these witnesses. Defense counsel did move to exclude Lt. Holmes's testimony. This, however, came at the close of his examination in chief.

Whatever grounds of objection might have been apt as to the never-introduced Exhibit 1, we need not speculate. The failure to object before an answer is made lets the evidence come in. Overruling a motion to exclude such answers is not reversible error.[6] Green v. State, 271 Ala. 106, 122 So. 2d 520.

Judge McElroy, in The Law of Evidence in Alabama (2d Ed.), Vol. 1, § 165.01(e), p. 391:

"It has been said that a party 'may remind' his own witness of a previous

6. Jackson v. State, 260 Ala. 641, 71 So.2d 825, which construes § 10 of the Act of June 24, 1943, for automatic appeals from death sentences, is not pertinent. This section is the only provision under the Plain Error doctrine of which we are aware in Alabama criminal appellate review. That the section sets up one rule of review for capital convictions and another for other cases is beyond the jurisdiction of this court.

inconsistent statement by him, for the purpose of refreshing his recollection, e. g., 'by reminding the witness of his testimony before the grand jury' (Glenn v State, 157 Ala. 12, 47 So. 1034) or by 'reminding the witness of his testimony on the former trial' (Woodard v State, 253 Ala. 259, 44 So 2d 241, syl 13).

"The quoted statements of the Supreme Court do not mean that counsel can properly state in the presence of the jury that the witness testified to certain things before the grand jury or on a former trial. Although a party for the purpose of showing his surprise or of refreshing his own witness' recollection, may ask the witness whether he gave certain testimony on the prior occasion, it is decidedly improper for counsel to declare th. : the witness in fact gave such testimony (Kirkpatrick v. State, 18 Ala.App. 389, 92 So. 238, syl 1)—for the reason that counsel himself would, in effect, be giving testimony."

The Kirkpatrick opinion rests on Billingslea v. State, 85 Ala. 323, 5 So. 137, Thompson v. State, 99 Ala. 173, 13 So. 753, and Mayfield's Dig. 880.

In the second paragraph of the Billingslea opinion, Stone, C. J., points out that in the absence of an answer, the bill of exceptions "was not enough to raise the question." In Thompson the witness "had just stated that he did not remember how many times he had been to Edmund Stegars' house." The solicitor then asked him questions from a memorandum of his testimony before the grand jury.

We do not understand that there is any contention that the solicitor attempted to use Loyd's written confession for any purpose—at least in examining Loyd—other than to jog his memory. Refreshing Loyd's memory was permissible because of his claiming not to know, not being sure and the like.

After the solicitor read portions to him and Loyd began claiming immunity from self-crimination throughout the twenty-one questions, Douglas's counsel stopped objecting.

In this state of the record, even though it might be claimed that the repeated and cumulative use of the confession might have been an indirect mode of getting the inadmissible confession in evidence, yet the failure to object was waiver. There must be a ruling sought and acted on before the trial judge can be put in error. Here there was no ruling asked or invoked as to the questions embracing the alleged confession.

## VII.

### Arraignment

Douglas's contention that he was never arraigned is unsupported by any fact in or out of the record. He filed a motion for new trial. From the order denying it, it appears that the motion was submitted on the trial transcript without other proof being adduced.

The case of Hamilton v. Alabama, 368 U. S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 [see 273 Ala. 504, 142 So.2d 868], was a coram nobis proceeding. The opinion on appeal, 270 Ala. 184, at 188, 116 So.2d 906, at 910 (cert. den. 363 U.S. 852, 80 S.Ct. 1638, 4 L.Ed.2d 1737), shows an unsuccessful collateral attack on the record judgment by use of bench notes.

Here we have only an ipse dixit to contradict the record. The record shows arraignment.

## VIII.

### Sufficiency of the Evidence

Regarding the sufficiency of the evidence, we start with no dispute as to the corpus delicti being shown.

The agency of Douglas's committing (or aiding and abetting Loyd in committing) the assault by shotgun on Warren must rest on circumstantial evidence.

We consider the record shows sufficient evidence to support the verdict and the judgment on it. We refer particularly to the following:

1) The finding in the cab of the truck of a plastic wad from a "Peters" shotgun shell.

2) The testimony of Warren and Gorff as to the 1959 White Ford with one burned-out tail light seen by them on Highway 5 shortly before the shooting.

3) The car's bearing Jefferson County tags (i. e., with "1A" prefix) at one time, and Etowah County tags ("31") at another.

4) The testimony of Mr. Williamson as to his seeing Loyd and Douglas in a 1959 White Ford with one burned out tail light with a shotgun and shells at the road block.

5) The evidence of Loyd and Douglas being in the car at Ohatchee.

6) The various guns (e. g., rifle in front grill) in car.

7) "Peters" 00 magnum shells found in car.

8) Possession of two sets of license plates.

9) The nine and a half mile roadside search on Highway 5 leading to the finding of the shell—Exhibit 2.

10) Finley's testimony, particularly as to

(a) connection of shell and shotgun;

(b) distance of shot from truck (permitting inference which would exclude roadside pedestrian's firing); and

(c) identification of plastic wad.

Remoteness of time and also of place from the res gestae is a matter left to the jury if there is other relevance in a circumstance. Busbee v. State, 36 Ala.App. 701, 63 So.2d 290; Petty v. State, 40 Ala. App. 151, 110 So.2d 319; Dortch v. State, 40 Ala.App. 475, 115 So.2d 287; Pitts v. State, 40 Ala.App. 702, 122 So.2d 542. See also Mott v. State, 40 Ala.App. 144, 109 So. 2d 309, and McElroy, Evidence (2d Ed.), Vol. 1, § 21.01(3), pp. 16–17.

The circumstance of an accused's fleeing is admissible as an admission.

Thus, in Goforth v. State, 183 Ala. 66, 63 So. 8, there were two men indicted for the murder of Nicholas Shintzen. The opinion refers approvingly to proof of various efforts (such as leaving trains at unusual places, using assumed names, etc.) bearing on whether the accused were *fugitives from justice.*

In Crenshaw v. State, 225 Ala. 346, 142 So. 669, the defendant tried a disguise and gave another name. Bouldin, J., characterized this ruse as "admissible on the same principle as evidence of flight."

We consider evidence of the change of license plates between the scene of the shooting and the roadblock at Woodstock was relevant to show a wish to escape detection.

We have reviewed the entire record and consider the judgment of the circuit court should be

Affirmed.